Slip Op. 13-15

UNITED STATES COURT OF INTERNATIONAL TRADE

CORNING GILBERT INC.,

                    Plaintiff,

         v.

UNITED STATES,

                    Defendant.

Before: Leo M. Gordon, Judge

Court No. 11-00511

**OPINION**

[Plaintiff's motion for summary judgment granted; Defendant's cross-motion for summary judgment denied.]

Dated: February 1, 2013

Joseph P. Lavelle and Andrew N. Stein, DLA Piper US LLP, of Washington, DC for Plaintiff Corning Gilbert Inc.  Also with them of the brief was Ralph L. Sheppard, Meeks, Sheppard, Leo & Pillsbury LLP, of Fairfield, CT.

Amy M. Rubin, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY for Defendant United States.  With her on the brief were Karen V. Goff and Marcella Powell, Trial Attorneys.  Also with them on the brief were Stuart F. Delery, Acting Assistant Attorney General, Barbara S. Williams, Attorney in Charge.  Of counsel were Beth C. Brotman and Michael Heydrich, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of New York, NY.

Gordon, Judge:  This action arises from a decision by U.S. Customs and Border

Protection ("Customs") to exclude certain of Plaintiff's merchandise from entry into the

commerce of the United States.   Customs refused entry to Plaintiff's merchandise

based on a General Exclusion Order (the "650 GEO") issued by the U.S. International

Trade Commission ("ITC") in Investigation No. 337-TA-650 (the "650 Investigation").

The 650 GEO prohibits unlicensed entry of coaxial cable connectors that infringe claim

1 and/or claim 2 of U.S. Patent 6,558,194 (the "'194 Patent").   Plaintiff Corning Gilbert

Inc. ("Corning Gilbert") timely protested the exclusion and, pursuant to 19 U.S.C.

§ 1515(a) and 19 C.F.R. §§ 174.24 and 177.2, applied for further review, and requested

an administrative ruling from Customs Headquarters.   Responding to the application for

further review and request for a ruling, Customs issued HQ H194336 ("HQ Ruling").   In

the HQ Ruling, Customs held, *inter alia*, that Corning Gilbert's UltraRange® and

UltraShield™ coaxial cable connectors (the "Excluded Connectors") were properly

excluded from entry for consumption because they are covered by the 650 GEO.

Customs accordingly instructed the Port Director to deny Corning Gilbert's protest with

respect to the Excluded Connectors.   In this action, Corning Gilbert challenges the

denial of its protest.   Claiming no genuine issue as to any material facts, the parties

have filed cross-motions for summary judgment.   Corning Gilbert Inc.'s Mot. for Summ.

J. of Non-Infringement and Mem. in Supp. of Mot., ECF No. 86 ("Pl.'s Br.") and Mem. in

Supp. of Def.'s Mot. for Summ. J., ECF No. 88 ("Def.'s Br.").   The court has jurisdiction

pursuant to 28 U.S.C. § 1581(a) (2006)[1].

---

[1] Further citation to Title 28 of the U.S. Code is to the 2006 edition.

## I. Background

In 2008 the owner of the '194 Patent petitioned the ITC to investigate, pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 (2006)[2], the alleged unfair importation of merchandise infringing the '194 Patent.  Am. Compl., ECF No. 16 ¶ 21 and Answer, ECF No. 27 ¶ 21; In the Matter of Certain Coaxial Cable Connectors and Components Thereof and Products Containing Same, Inv. No. 337-TA-650 (Apr. 14, 2010) ("ITC Opinion") at 2.  Corning Gilbert was not a named respondent in this investigation.  See ITC Opinion at 2-3.  Moreover, all of the respondents that were alleged to have infringed the '194 Patent either defaulted in the 650 Investigation or were terminated from the investigation based on a consent order.  Id. at 3.  At an evidentiary hearing before the Administrative Law Judge ("ALJ"), the complainant's expert witness testified that certain connectors of the defaulting respondents – including a connector referred to as the Fei Yu FY-037 – met all limitations of claims 1 and 2 of the '194 Patent.  Def.'s Ex. D, ECF No. 85-1 (excerpt from ALJ Gildea's initial determination in ITC Inv. No. 337-TA-650 (Oct. 13, 2009) ("ALJ Determination")) at 52 and 55.  No party contested this testimony, either during the hearing or in the post-hearing briefing.  Id. at 52, 55 and nn. 18, 20.  The ALJ found that the complainant's undisputed evidence presented showed that the defaulting respondents' connectors infringed claims 1 and 2 of the '194 Patent.  Id. at 54 and 56.  The ITC did not review the ALJ's finding in this regard, and issued the 650 GEO prohibiting unlicensed entry of any coaxial cable connectors that infringe claims 1 or 2 of the '194 Patent.  ITC Opinion

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Tile 19 of the U.S. Code, 2006 edition.

at 1-2 and 63; General Exclusion Order, Inv. No. 337-TA-650 (ITC Mar. 31, 2010), Def.'s Ex. A, ECF No. 85-1 ("650 GEO").

Coaxial cable is a type of cable that has a central electrical conductor (usually a flexible wire), surrounded by a dielectric insulating layer and one or more outer conductors (typically a foil surrounded by woven metallic braid).



Joint Statement of Material Undisputed Facts, ECF No. 77 ("J. Stmt. of Facts") ¶¶ 3, 16-17; Decl. of Donald A. Burris, Pl.'s Ex. 2, ECF No. 86-3 ("Burris Decl.") ¶¶ 4-5; Decl. of Dr. Michael Littman, Pl.'s Ex. 3, ECF No. 86-4 ("Littman Decl.") ¶¶ 21-22. Coaxial cable has many uses, but a very common one today is to connect TVs, set-top boxes, computers, DVD players, and the like to sources of programming, such as satellite dishes and cable TV lines. Id.

To connect a coaxial cable to a device, such as a DVD player, the central (signal) and outer (ground) electrical conductors of the cable must be securely connected to the respective central and outer portions of the DVD receptacle. J. Stmt. of Facts ¶ 18; Burris Decl. ¶ 6; Littman Decl. ¶ 23. Poor electrical connections on either the signal or ground portion of the connector can result in radio frequency leakage or distortion, and

can cause the DVD's operation to be degraded.  Littman Decl. ¶ 23.  Coaxial cable

connectors are designed to minimize that leakage or distortion.  See id.  Connectors

also provide a seal to protect the exposed elements of the cable from moisture or other

environmental effects.  J. Stmt. of Facts ¶ 21; Burris Decl. ¶ 10.  To attach a connector

to the coaxial cable, the center conductor, insulating layer, and foil typically are inserted

into a central post in the connector, while the outer braid is captured in a bore about the

post.  J. Stmt. of Facts ¶ 20; Burris Decl. ¶ 8; Littman Decl. ¶ 25.

The invention described in the '194 Patent involves a coaxial cable connector

that connects to the cable by way of a two-step process.  '194 Patent, Pl.'s Ex. 1, ECF

No. 86-2, at 2:43-46.  In the "first configuration," as shown in Figure 1 of the '194 Patent,

the cable is threaded through a "fastener member"/ "compression ring" (28).  See id. at

7:39-60.  J. Stmt. of Facts ¶ 22.



*Fig. 1*

Then, in the "second configuration," as shown in Figure 5 of the '194 Patent, the

fastener member/ compression ring (28) is moved over the "connector body" (24).  J.

Stmt. of Facts ¶ 23.



*Fig. 5*

The inner diameter of the fastener is smaller than the outer diameter of the body, so that when the fastener is moved over the body in the second configuration (using a special tool), the body is deformed beneath the fastener in order to grip the cable and create the desired seal. <u>See</u> '194 Patent at 8:38-50. One advantage of the '194 Patent over prior coaxial cable connectors was that its design "eliminate[d] the need for an O-ring or other seal between the connector body (24) and the fastener member (28)." <u>Id.</u> at 8:53-57. Both claims 1 and 2 of the '194 Patent contain the limitation that the connector body have a cylindrical sleeve at one end that deforms radially inward as the fastener is advanced axially over the body. '194 Patent at 13:35-45 (element (c) of claim 1, requiring a cylindrical sleeve at one end of the connector's cylindrical body that is deformable); 14:1-7 (element (e) of claim 1, requiring that the deformable cylindrical sleeve be deformed by advancing the fastener/ compression ring axially over the cylindrical body member); 14:24-35 (element (c) of claim 2, identical to element (c) of claim 1) and 14:50-56 (element (e) of claim 2, identical to element (e) of claim 1).

Corning Gilbert's Excluded Connectors are not materially different from one another, and may be described in relevant part without differentiating among them. <u>See</u> Burris Decl. ¶¶ 33-34.  Like most conventional coaxial cable connectors, the Excluded Connectors contain an inner cylindrical post to receive the inner conductor (wire) and dielectric insulating layer of the cable; a connector body surrounding the post that creates a bore to receive the outer conductor (metallic braid) of the cable; and a fastener that moves over the body to create a seal.  <u>See</u> <u>id.</u> ¶¶ 36-37; '194 Patent at 1:29-42 (describing typical composition of conventional coaxial cable connectors).  In addition to these components, the Excluded Connectors also have a component which is referred to as a "deformable gripping ring."  <u>Id.</u> at ¶ 37 (quoting U.S. Pat. No. 7,182,639 at 14:33-40).  This gripping ring is attached to the inside of the fastener using a press fit.  <u>Id.</u> at ¶ 38.  As the fastener is moved over the body using a special tool, the gripping ring is forced underneath the body, whereupon the gripping ring is deformed in order to grip the cable and create the seal.  <u>Id.</u> at ¶ 44.  The part of the connector which surrounds the tubular post to create the bore that receives the cable's outer conductor is not deformed when the fastener is moved over the body to create the seal.  <u>Id.</u> at ¶ 45.  Only the gripping ring is deformed in this process.  <u>Id.</u>  Below are representative drawings of the Excluded Connectors in the first and second configurations, respectively:



Burris Decl. ¶¶ 42, 44; J. Stmt. of Facts ¶¶ 47, 81.

In support of its application for further review and request for a ruling, Corning Gilbert argued that the Excluded Connectors do not meet the claim limitations of claims 1 and 2 of the '194 Patent because the Excluded Connectors do not exhibit a cylindrical body member with a deformable cylindrical sleeve.  HQ Ruling, Pl.'s Exs. 15A and 15B, ECF Nos. 86-20 and 86-21, at 17.  In rejecting this argument, Customs concluded that the Excluded Connectors do in fact exhibit a cylindrical body member with a deformable cylindrical sleeve because the gripping ring is part of a composite cylindrical body that satisfies all of the limitations of the claims of the '194 Patent.  Id. at 18.  In reaching this

conclusion, Customs relied on the fact that the Fei Yu FY-037 device, which had a body member that is part metal and part plastic, was found to infringe the '194 Patent in the 650 Investigation.  Id. at 19 (citing to ITC record in the 650 Investigation).  Based on the HQ Ruling, Customs instructed the Port Director to deny Corning Gilbert's protest.

## II. Standard of Review

The court reviews Customs' denial of a protest de novo.  28 U.S.C. § 2640(a)(1); Ford Motor Co. v. United States, 35 CIT ___, ___, 800 F. Supp. 2d 1349, 1351 (2011). "A Customs decision does not enjoy a statutory presumption of correctness on questions of law, but may be entitled to respect proportional to its power to persuade." Ford Motor Co., 35 CIT at ___, 800 F. Supp. 2d at 1351 (citing Universal Elecs. v. United States, 112 F.3d 488, 492 (Fed. Cir. 1997) and United States v. Mead Corp., 533 U.S. 218, 220 (2001)).  In particular, Customs' decision "may surely claim the merit of its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight."  Mead, 533 U.S. at 235.

Summary judgment is appropriate if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  USCIT R. 56(c).

### III. Discussion

The material facts of this case are uncontested and the parties have filed cross-motions for summary judgment, each claiming entitlement to a favorable judgment as a matter of law.  See Pl.'s Br.; Def.'s Br.; J. Stmt. of Facts.  The following issues are before the court: (1) whether the HQ Ruling, which is the basis for Customs' denial of Corning Gilbert's protest, warrants any deference; (2) the proper claim construction for contested terms found in the claims of the '194 Patent; and (3) application of the claims of the '194 Patent, properly construed, to the Excluded Connectors.  The court addresses each issue in turn.

### A. Customs' Decision Does Not Warrant Deference.

The Government argues that the HQ Ruling is entitled to deference, pursuant to the Supreme Court's decision in United States v. Mead Corp., 533 U.S. 218 (2001), because the HQ Ruling is logical, persuasive, and thorough.  Def.'s Br. at 10-12; see Mead, 533 U.S. at 235 (written agency decisions may warrant deference in accord with their "thoroughness, logic, and expertness, [and] fit with prior interpretations, and any other sources of weight").  Corning Gilbert argues the contrary – that the HQ Ruling was hastily reached and is contrary to both reason and to established principles of patent law.  Pl.'s Br. at 31-33.  The court is not persuaded that Customs undertook such a logical, thorough, and expert analysis that would warrant deference.

Both, Corning Gilbert and the Government, based their respective arguments on Customs' reliance on the ITC finding that the Fei Yu FY-037 device infringed the '194

Patent (the "ITC Fei Yu finding").  See Pl.'s Br. at 31-33; Def.'s Br. at 23-26.  Initially, the

Government argues that Customs has a limited role with respect to Section 337

enforcement, and that it may only refuse entry to merchandise that the ITC has

"instructed" Customs to exclude.   In performing this limited role as an enforcer,

Defendant argues that that the court should uphold Customs' denial of Corning Gilbert's

protest because Customs merely applied the ITC's finding regarding the Fei Yu FY-037

device to Corning Gilbert's Excluded Connectors.   Def.'s Br. at 12-28.   In the

Government's view, Customs is simply required to determine whether the product

encompassed by the GEO is excluded from entry by applying the ITC record without

examining the underlying findings.  According to the Government, the ITC's findings are

the law of the case.  Consequently, Plaintiff is precluded from relitigating those findings

in a 1581(a) action challenging the exclusion.  The court disagrees.

Defendant is correct that ITC infringement findings are final and conclusive

unless appealed to the U.S. Court of Appeals for the Federal Circuit.  See 19 U.S.C.

§ 1337(c).   However, since Corning Gilbert was not a respondent in the 650

Investigation, the ITC did not find that Corning Gilbert's Excluded Connectors infringe

the '194 Patent.  Because Corning Gilbert has had no opportunity to litigate its position

before the ITC, the ITC's finding of infringement regarding the Fei Yu FY-037 device,

though final and conclusive as to that product, has no preclusive effect with regard to

the question of whether Corning Gilbert's Excluded Connectors infringe the claims of

the '194 Patent.  See Yingbin-Nature (Guangdong) Wood Indus. Co. v. United States,

535 F.3d 1322, 1332-33 (Fed. Cir. 2008) ("Yingbin-Nature") (noting that ITC findings of

infringement are preclusive only as to parties who have had a full and fair opportunity to litigate the issues before the ITC) (citing Comair Rotron, Inc. v. Nippon Densan Corp., 49 F.3d 1535, 1537 (Fed. Cir. 1995)).

Additionally, Defendant misapprehends the contours of an exclusion order. Typically, an exclusion order binds only parties that the ITC has found are violating Section 337. See 19 U.S.C. § 1337(d)(2). However, under certain circumstances, the ITC may issue a GEO, which broadly prohibits entry of merchandise that infringes the relevant claims of a particular patent without regard to whether the person(s) importing the merchandise were parties to, or were related to parties to, the underlying Section 337 investigation. See id. The ITC may also require parties and non-parties alike, as a condition of entry, to certify that the imported merchandise is not excluded from entry and thereby shift to those importers the burden of establishing non-infringement. See Am. Comp., Ex. A; see also Hyundai Elecs. Indus. Co. v. U.S. Int'l Trade Comm'n, 899 F.2d 1204, 1210 (Fed. Cir. 1990).

In enforcing an exclusion order issued by the ITC, Customs may exercise its discretion and have the importer furnish records or analyses to substantiate the certification. See id. Customs may effectively become more than a mere enforcer of the GEO. Customs may have to go beyond the mechanical application of the ITC's Section 337. It may have to look at evidence and analyze whether the importer, particularly a non-party such as Corning Gilbert, has established non-infringement. Consequently, it is difficult to conclude, under these circumstances, that an infringement

finding could not be subject to collateral attack in a proceeding that challenges the enforcement of a GEO.  See VastFame Camera, Ltd. v. Int'l Trade Comm'n, 386 F.3d 1108 (Fed. Cir. 2004) (allowing presentation of all legal and equitable defenses in a Section 337(b) enforcement proceeding).

Turning to the substance of Defendant's position, the Government essentially argues that the ITC Fei Yu finding necessitates a conclusion that the Excluded Connectors are within the scope of the 650 GEO.  And therefore, Customs' application of the ITC Fei Yu finding to the Excluded Connectors was therefore logical and thorough.  See Def.'s Br. 23-26.  Corning Gilbert, on the other hand, contends that Custom's reliance on the ITC Fei Yu finding was legal error, and therefore weighs against according deference to the HQ Ruling.  See Pl.'s Br. at 31-33.

The Government would have the court conclude that the ITC Fei Yu finding necessarily implies that the Excluded Connectors fall within the scope of the 650 GEO by infringing the claims of the '194 Patent.  See Def.'s Br. 23-26.  The only conclusions that can be drawn about the Fei Yu FY-037 ITC finding, however, are that (1) this product included a cylindrical body member that was part metal and part plastic and (2) the product was found to embody each and every claim limitation of the '194 Patent. See ALJ Determination; ITC Opinion; Def.'s Ex. C at 736 (claimant expert's testimony that the "cylindrical body" of the Fei Yu FY-037 product is "metal and then becomes plastic" (referencing photograph of product's cross section)).  Thus, the Government's argument is essentially that, because the Fei Yu product was found to infringe the

claims of the '194 Patent and had a cylindrical body member that was part metal and part plastic, all coaxial cable connectors embodying any type of plastic component which comes into proximity with a metal cylindrical body member necessarily infringe the claims of the '194 Patent.  See Def.'s Br. at 23-26; Def.'s Resp. to Pl.'s Mot. for Summ. J. at 6-11 ("Def.'s Resp."), ECF No. 106.

The Government's contentions regarding the ITC's findings in the 650 Investigation are misleading.  See, e.g., Def.'s Resp. at 6-11.  Contrary to the Government's contention, for example, it is not "obvious" that the cylindrical body member of the Fei Yu FY-037 connector was comprised of two "separate" portions. See id. at 6.  Although the complainant's expert described the cylindrical body member as part metal and part plastic, neither Customs nor this Court can say with any certainty whether the metal portion of this component within the Fei Yu FY-037 connector was "separate" from the plastic portion or somehow fused therewith, because the exhibits on record before the court provide no details or findings in this regard, and the Fei Yu FY-037 product is not in evidence.  See ALJ Determination; ITC Opinion; Def.'s Ex. C.

On the record before the court, there is no evidence to support the Government's contention that the ITC made findings requiring a conclusion that the Excluded Connectors infringe the claims of the '194 Patent.  The ITC Fei Yu finding, while final and conclusive as to that product, does not require such a conclusion as to the Excluded Connectors because (1) no evidence has been presented to Customs or to this Court to suggest that the Excluded Connectors are materially identical to the Fei Yu

FY-037 product; and (2) Corning Gilbert has had no opportunity to be heard with regard

to the question of the Fei Yu FY-037 product's infringement of the '194 Patent.  See

Yingbin-Nature.  As there is no evidence suggesting that Customs had any additional

information regarding this matter, the HQ Ruling's reliance on the mere finding by the

ITC that a different manufacturer's different product infringed the '194 Patent does not

weigh in favor of deference based on the Ruling's thoroughness, logic, and

persuasiveness.  See Mead, 533 U.S. at 235.

Indeed, the ITC's infringement finding, bare as it is, does not speak directly to the

question before the court, which is whether the Excluded Connectors were properly

excluded pursuant to the 650 GEO for infringing the claims of the '194 Patent.  See

Atlantic Thermoplastics Co. v. Faytex, 970 F.2d 834, 846 (Fed. Cir. 1992) ("Faytek")

(collecting cases holding that proper infringement analysis compares the accused

device to the properly construed patent claims, not to other products).  As noted, the

ITC never examined the Excluded Connectors, nor made any infringement findings

regarding the Excluded Connectors, nor allowed Corning Gilbert an opportunity to be

heard on the question of whether the Excluded Connectors "infringe claim 1 or claim 2

of the '194 Patent," to quote the 650 GEO.  Thus to support the exclusion of the

Excluded Connectors pursuant to the 650 GEO, Customs had to make a substantive

determination that the Excluded Connectors infringe claim 1 or claim 2 of the '194

Patent.  Compare 19 U.S.C. § 1337(d)(2) (providing that, in the absence of certain

special circumstances – such as those found to apply in the 650 Investigation – ITC

exclusion orders are usually "limited to persons determined by the Commission to be

violating this section").  As a result, the exclusion of the Excluded Connectors is not, as

the Government would have the court conclude, merely a ministerial application of the

ITC's findings in the 650 Investigation.  <u>See</u> Def.'s Br. at 23-26.

        To make a substantive determination that the Excluded Connectors infringed

claim 1 or claim 2 of the '194 Patent, Customs engaged in traditional patent

infringement analysis.  HQ Ruling at 5 ("The issue presented is <u>whether the excluded</u>

<u>connectors . . . are covered by claims 1 or 2 of the '194 Patent</u> and therefore fall within

the scope of the 650 GEO.") (emphasis added) and 7-11 (presenting the principles of

traditional patent analysis as the governing legal framework).   Nevertheless, the

Government argues that Customs cannot be expected nor required to perform "a

comprehensive patent infringement analysis for every potentially excludable product"

because the applicable regulations provide only 30 days for Customs to act on a protest

of exclusion.  Def.'s Resp. at 5 (citing 19 C.F.R. § 174.21).   This argument implies,

however, that Customs undertakes no analysis whatsoever until a protest is filed, which

is after Customs has already made the decision to exclude.  To the contrary, Customs is

to make reasoned and deliberate decisions regardless of whether or not such decisions

are subsequently protested.  <u>See</u> <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S.

156, 167-68 (1962) (holding that agencies must engage in reasoned decision-making).

The 30 days allowed by the regulation to act on a protest provide time for the agency to

explain the analysis and reasoning underlying the protested decision, not to engage in

thinking about this decision for the first time.  Accordingly, the regulatory time limit for

addressing a protest of exclusion does not excuse Customs from performing a proper analysis before deciding to exclude merchandise.

"Patent infringement is a two-step inquiry.  First, the [infringement decision-maker] must construe the asserted claim.  Second, the [infringement decision-maker] must determine whether the accused product or process contains each limitation of the properly construed claims."  Tessera, Inc. v. Int'l Trade Comm'n, 646 F.3d 1357, 1364 (Fed. Cir. 2011) (internal quotation and alteration marks and citation omitted).  The scope of any contested claim terms must be determined "with a full understanding of what the inventors actually invented and intended to envelop with the claim."  Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc).  Here, the Government places much emphasis on the ALJ's conclusion during the 650 Investigation that, because the claim terms of the '194 Patent were not contested by any party to that proceeding, it was proper to give them their "ordinary meaning."  See, e.g., Def.'s Resp. at 12; ALJ Determination at 27.  Pursuant to well-settled principles of patent law, however, the "ordinary meaning" of patent claim terms is the meaning they hold for a person of ordinary skill in the relevant art.  Phillips, 415 F.3d at 1313.  Because the "ordinary meaning" that terms may have for persons skilled in the relevant art may not always be readily apparent to persons not skilled in that art, contested claim terms must be construed by way of an "inquiry into how a person of ordinary skill in the art understands [such] term[s]."  Id. (citations omitted).  "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation[,] [and] [t]hat starting point is based on the well-

settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." Id. (citations omitted); see also Moba v. Diamond Automation, Inc., 325 F.3d 1306, 1315 (Fed. Cir. 2003) ("[T]he best indicator of claim meaning is its usage in context as understood by one of skill in the art at the time of the invention."); Biodex Corp. v. Loredan Biomedical, Inc., 946 F.2d 850, 862 (Fed. Cir. 1991) ("[Plaintiff]'s suggestion that lay jurors would be able to determine the scope of the terms in the [relevant] patent from their 'plain' meaning ignores the language of the disputed terms and the fact that claims are drafted to be read by those skilled in the art, rather than lay persons.").

In this case, although Corning Gilbert placed the claim term "cylindrical body member" squarely at issue, HQ Ruling at 17, Customs did not construe the term by reference to the meaning it carries for a person skilled in the art of coaxial cable connectors. See id. Indeed, Customs did not construe the term at all. See id. Nor did Customs explain why it rejected Corning Gilbert's proposed construction. See id.; Am. Compl., Ex. D (Corning Gilbert's protest regarding the Excluded Connectors) at 13-17 (discussing claim construction and proposing a construction for "cylindrical body member"). The Government argues that Customs was precluded from engaging in claim construction because the ITC itself did not construe the claims of the '194 Patent, but the Government provides no legal support for this proposition. See Def.'s Br. at 25-26. The ITC did not construe the claims of the '194 Patent because no party contested the terms comprising those claims during the 650 Investigation. See ITC Opinion at 3

(noting that all of the respondents alleged to infringe the '194 Patent either defaulted or were terminated from the investigation based on a consent order); ALJ Determination at 27 (noting that the claim terms of the '194 Patent were not in issue).  In protesting the exclusion of its merchandise, however, Corning Gilbert contested the implicit interpretation given by Customs to the term "cylindrical body member" when determining that the Excluded Connectors infringed the claims of the '194 Patent. Protest at 13-17.  A proper analysis of whether the Excluded Connectors were properly excluded by necessity requires the court to examine whether those connectors infringe the claims of the '194 Patent, and must therefore begin with the construction of the claim term "cylindrical body member."  Because Customs did not engage in this claim construction, its decision is not so thorough, logical, nor expert as to warrant deference pursuant to Mead.

## B. Claim Construction

Undertaking de novo the question of whether the Excluded Connectors infringe claims 1 and/or 2 of the '194 Patent, the court applies the two-step patent infringement analysis set forth by the Court of Appeals for the Federal Circuit.  See, e.g., Tessera, 646 F.3d at 1364.  Thus, the court must first construe the contested claim term "cylindrical body member."  See id.; Pl.'s Br. at 18 (proposing claim term construction); Def.'s Br. at 27 (contesting Plaintiff's claim term construction).  Corning Gilbert proposes that the term "cylindrical body member" should be construed as the "generally cylindrical shaped outer portion of the connector that surrounds the tubular post to define a central

bore." Pl.'s Br. at 18. The Government proposes the following construction: "[t]he generally cylindrical shaped portion of the connector that has a cylindrical sleeve on one end and that engages the tubular post on the other end." J. Claim Construction Stmt., ECF No. 76, at 2.

The Government objects to the word "outer" in Corning Gilbert's proposed construction for the claim term "cylindrical body member." Def.'s Resp. at 12-14. The Government is correct that this word does not appear in the language of the claims of the '194 Patent. See '194 Patent. The emphasis in Corning Gilbert's proposed construction, however, is on the limitation that the cylindrical body member must surround the tubular post to create a bore thereabout for accepting the cable jacket. See, e.g., Pl.'s Resp. at 1, 4 (emphasizing the limitation that the cylindrical body member define a chamber or cavity about the post). As explained below, this limitation – which appears in the plain language of both claims of the '194 Patent but is markedly absent from the Government's proposed construction – is dispositive of the issue before the court. Accordingly, the court need not rely on the word "outer" in Corning Gilbert's proposed construction. Moreover, the court does not have to delve into nor resolve the dispute about whether "outer" should be included when construing the term "cylindrical body member" in accordance with its ordinary meaning for a person skilled in the art of coaxial cable connectors.

The substantive difference between the parties' proposed constructions for the claim term "cylindrical body member" is Corning Gilbert's emphasis on, and the

Government's omission of, the requirement that the body surround the post to create a bore to receive the cable jacket.  The requirement that the body create a bore about the post features prominently in the claim language, which describes the cylindrical body member as "having a first end and a second end, the first end of said cylindrical body member including a cylindrical sleeve having an outer wall of a first diameter and an inner wall, the inner wall <u>bounding a first central bore extending about said tubular post</u> . . . ."  '194 Patent at 13:35-40 (element (c) of claim 1) and 14:24-30 (element (c) of claim 2) (emphasis added).  A plain reading of the language of the claims thus supports Corning Gilbert's construction over that of the Government.

Corning Gilbert supports its proposed construction with reference to the remaining language of the claims, the remainder of the specification, and the prosecution history of the '194 Patent.  Pl.'s Br. at 18-22; <u>see</u> <u>Toshiba Corp. v. Imation Corp.</u>, 681 F.3d 1358, 1366 (Fed. Cir. 2012) ("The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art <u>when read in the context of the specification and prosecution history</u>.") (emphasis added).  First, Corning Gilbert argues that its proposed construction comports with the claim language requiring that the body member be "cylindrical" and have an end that "engag[es]" the tubular post.  <u>Id.</u> at 18 (citing J. Stmt. of Facts ¶ 38 (quoting claim 1 of the '194 Patent)).  Next, Corning Gilbert contends that its proposed construction also comports with the remainder of the specification in the '194 Patent, which discusses "an outer component designed to coact with an inner post in securely and sealingly clamping the outer portion of the cable there between."  <u>Id.</u> (citing J. Stmt. of Facts ¶ 26

(quoting the '194 Patent at 1:40-43)).  Corning Gilbert also points out that "[n]owhere

does the specification disclose a cylindrical body member to be anything other than the

generally cylindrical shaped outer portion of the connector that surrounds the tubular

post to define a central bore . . . ."  Id. at 19.  Finally, Corning Gilbert argues that the

prosecution history of the '194 Patent reveals that that the term "cylindrical body

member" had a well-settled meaning in the art before the '194 Patent was issued,

referring to the generally cylindrical shaped portion of the connector that surrounds the

tubular post to define a central bore.  Id. at 20-21 (citing U.S. Patent Nos. 5,073,129,

4,834,675, and 5,470,257).

In addition, Corning Gilbert supports its proposed construction with a sworn

declaration from Dr. Michael Littman,[3] an expert skilled in the art of coaxial cable

connectors.  See Littman Decl. ¶ 56.  The Government does not contest that Dr. Littman

is an expert skilled in the art of coaxial cable connectors.  See generally Def.'s Br.

(making no mention of Dr. Littman's declaration).  Based on Dr. Littman's unopposed

sworn declaration, the court concludes that, for purposes of constructing the claim terms

of the '194 Patent, Dr. Michael Littman is an expert skilled in the art of coaxial cable

connectors.  See Littman Decl. at ¶ 20 (defining "person of ordinary skill in the art" as

"someone with a physics background with working knowledge of the disciples of

---

[3] Dr. Michael Littman is a Professor of Mechanical and Aerospace Engineering at
Princeton University, where he has been a member of the faculty since 1979.  Littman
Decl. ¶ 3.  Dr. Littman has 35 years of experience as a researcher and educator in the
fields of mechanics, optics, lasers, electronics, control systems, and computer
engineering.  Id. at ¶ 5.  Among the graduate-level courses that Dr. Littman teaches at
Princeton University is a course covering, inter alia, the design and implementation of
radio-frequency transmission systems, including coaxial cables.  Id. at ¶ 7.

electromagnetism and mechanics, or a mechanical engineer having knowledge of radio-frequency electronic instrumentation, or an electrical or communications engineer having knowledge of mechanical systems").  Dr. Littman's declaration supports Corning Gilbert's proposed construction for the claim term "cylindrical body member" in that Dr. Littman declares that one skilled in the art would understand that "the connector body is usually cylindrical in shape and surrounds the central post and partially defines a bore where the cable jacket and braided conductor are received."  Littman Decl. at ¶ 56.

The Government has not submitted any expert affidavits from persons skilled in the art of coaxial cable connectors in support of its alternative construction.  See generally Def.'s Br.  Corning Gilbert's proposed construction for the claim term "cylindrical body member" in claims 1 and 2 of the '194 Patent accords with the remaining claim language, the specification, and prosecution history of the '194 Patent. Moreover, Corning Gilbert's proposed construction is supported by an uncontroverted declaration from an expert skilled in the art of coaxial cable connectors.  On this basis, the court construes the claim term "cylindrical body member" in claims 1 and 2 of the '194 Patent to mean the "generally cylindrical shaped portion of the connector that surrounds the tubular post to define a central bore."  See Pl.'s Br. at 18; Littman Decl. at ¶ 56.

## C. Infringement Analysis

Having construed the contested claim term, the court turns to whether the Excluded Connectors contain each limitation of the claims of the '194 Patent.  See

Tessera, 646 F.3d at 1364.  To find that the Excluded Connectors infringe a claim of the

'194 Patent, the court must find each and every limitation of the claim embodied in the

Excluded Connectors.  See, e.g., V-Formation, Inc. v. Benetton Gr. SpA, 401 F.3d

1307, 1312 (Fed. Cir. 2005) ("Literal infringement requires that each and every limitation

set forth in a claim appear in an accused product."); Faytex Corp., 970 F.2d at 846 ("An

accused infringer can avoid infringement by showing that the accused device lacks

even a single claim limitation.").

Corning Gilbert argues that the Excluded Connectors fail to meet the limitation

included in both claims 1 and 2 of the '194 Patent that the connector's cylindrical body

member have a cylindrical sleeve that is deformable. Pl.'s Br. at 24-25; see '194 Patent

at 13:35-45 (element (c) of claim 1, requiring a cylindrical sleeve at one end of the

connector's cylindrical body that is deformable); 14:1-7 (element (e) of claim 1, requiring

that the deformable cylindrical sleeve be deformed by advancing the fastener/

compression ring axially over the cylindrical body member); 14:24-35 (element (c) of

claim 2, identical to element (c) of claim 1) and 14:50-56 (element (e) of claim 2,

identical to element (e) of claim 1).

It is both uncontested and clear from the representative diagrams of the

Excluded Connectors that Corning Gilbert's "gripping ring" is the only component that

deforms when the fastener/compression ring is advanced axially over the remainder of

the connector.  See J. Stmt. of Facts ¶¶ 47-70.  Corning Gilbert argues that the gripping

ring is a separate component from the connector body, and that the Excluded

Connectors therefore do not contain a necessary limitation of claims 1 and 2 of the '194

Patent, namely that the connector body have a deformable cylindrical sleeve at one of

its two ends.  Pl.'s Br. at 24-25.  The Government contends, as Customs determined in

the HQ Ruling, that the claim limitation of a deformable cylindrical sleeve at one end of

the cylindrical body member is found in the Excluded Connectors if the gripping member

is considered to be part of a composite cylindrical body member within these

connectors.  Def.'s Br. at 28-29; HQ Ruling at 18-19.

Based on the claim construction adopted above, as well as the plain language of

element (c) of the two respective claims of the '194 Patent, the cylindrical body member

must engage with the tubular post at one end and surround the tubular post to create a

bore for the cable's outer jacket.  '194 Patent at 13:35-45 (element (c) of claim 1) and

14:24-35 (element (c) of claim 2).  In the Excluded Connectors, as seen in the

representative diagram below, see J. Stmt of Fact at ¶ 47, the cylindrical component

that engages with the tubular post (1) at one end and surrounds said post to create a

bore (5) for the cable's outer jacket (6) is the component referred to as the body (2) by

Corning Gilbert.  See Littman Decl. at ¶ 75 ("The body in the Corning Gilbert connectors

is nearly identical in shape and location to the cylindrical body member shown in the

'194 Patent.  It is attached to the tubular post on one end and has a cylindrical sleeve at

the open end.  Given the similarity in location, structure, and function of the Corning

Gilbert body, it is straightforward to identify this part as the part that corresponds to the

'cylindrical body member' claimed in the '194 Patent.").



As the fastener (4) advances axially over the open end of this body component (2), however, the latter does not deform.  Instead, as the fastener (4) advances axially over the open end of the body component (2), the gripping ring (3), which is located inside the fastener (4), is squeezed under the rigid body component (2) and is deformed radially to grip the cable.  Although the gripping ring may be in close proximity to the connector body, it is not essential to the design and function of the Excluded Connectors for the body and the gripping ring to touch in the open position.  Littman Decl. at ¶ 38; Burris Decl. at ¶ 39.  Rather, the gripping ring is a separate component from the connector body, and has a separate function.  Littman Decl. at ¶ 76. Specifically, while the connector body engages with the tubular post to define a bore about said post for the cable jacket, the gripping ring is squeezed into that bore to grip the cable and create the desired seal.  Id.  This understanding is consistent with how persons skilled in the art of coaxial cable connectors would view the components of the Excluded Connectors.  Littman Decl. at ¶ 76 ("[T]hose skilled in the art would not consider a gripper or compression sleeve that slides under the body to be part of the body.") (emphasis added).  Considering the gripping ring to be a separate component

from the connector body is also consistent with the specification of the '194 Patent, which notes that the connectors covered by that patent are particularly advantageous over other models in that they eliminate the need for a separate seal between the connector body and the fastener member.  Id. at 8:53-57.  In the Excluded Connectors, the gripping ring is precisely such a separate seal between the connector body and the fastener member.  See Littman Decl. at ¶ 63.

Moreover, as seen in the diagram, the gripping ring (3) is irregularly shaped, with at least three different diameters, so if it was considered part of the connector body, the connector body could not have a cylindrical sleeve at the end opposite to that attached to the post.  See, e.g., The Amer. Heritage Dictionary 453 (4th ed. 2000) (defining "cylindrical").  In addition, the gripping ring (3) is located in the fastener (4) and extends beyond the tubular post (1).  Therefore, the inner wall of the gripping ring does not form a bore about the tubular post as required by claim element (c) in both claims of the '194 Patent.  Littman Decl. at ¶ 82; see '194 Patent at 13:35-45 (element (c) of claim 1) and 14:24-35 (element (c) of claim 2).  Since the claims of the '194 Patent require that the connector body have a "cylindrical" sleeve and form a bore about the tubular post, '194 Patent at 13:35-45 and 14:24-35, the Excluded Connectors would not meet these claim limitations even if the court concluded (contrary to the understanding of those skilled in the art, see Littman Decl. at ¶ 76) that the gripping ring is part of the connector body.

Accordingly, the court finds that the Excluded Connectors do not infringe claim 1 nor claim 2 of the '194 Patent because the connector body components within the

Excluded Connectors do not meet the claim limitations requiring that those components have a deformable cylindrical sleeve at one end.  See '194 Patent at 13:35-45 and 14:24-35.

## IV. Conclusion

For all of the foregoing reasons, the court finds that the Excluded Connectors do not infringe claim 1 or claim 2 of the '194 Patent.  The Excluded Connectors therefore fall outside the scope of the 650 GEO and were improperly excluded from entry. Judgment will issue ordering Customs to admit the Excluded Connectors into the United States.[4]


_____/s/ Leo M. Gordon_____
Judge Leo M. Gordon


Dated: February 1, 2013
        New York, New York

---

[4] To the extent that Plaintiff seeks prospective permanent injunctive relief, see Am. Compl. at 21-22, regarding entries that are not subject to the protest that is covered by this action, such request is beyond the scope of this action and the court's jurisdiction under 28 U.S.C. § 1581(a).

UNITED STATES COURT OF INTERNATIONAL TRADE

CORNING GILBERT INC.,

                Plaintiff,

       v.

UNITED STATES,

                Defendant.

Before: Leo M. Gordon, Judge

Court No. 11-00511

**JUDGMENT**

This case having been submitted for decision, and the court, after due deliberation, having rendered an opinion; it is hereby

**ORDERED** that Defendant's motion for summary judgment is denied; it is further

**ORDERED** that Plaintiff's motion for summary judgment is granted; it is further

**ORDERED** that U.S. Customs and Border Protection shall take action in accordance with <u>Corning Gilbert Inc. v. United States</u>, Slip Op. 13-15 (Feb. 1, 2013) including the release of the subject merchandise for entry into the United States; and it is further

**ORDERED** that Plaintiff's requests for permanent injunctive relief are denied.

                                    _____/s/ Leo M. Gordon_____
                                      Judge Leo M. Gordon

Dated: February 1, 2013
       New York, New York